A93A2076. BIGGS v. LONG.
A93A2077. HORNE, UPCHURCH, WATERS & ASSOCIATES, INC. v. LONG.
(441 SE2d 677)

ANDREWS, Judge.

Biggs, the owner, and Horne, Upchurch, Waters & Associates, Inc. (Horne), the real estate broker/manager of the rental property, separately appeal from the judgment entered on the jury's verdict in Long's suit for damages arising from her fall from the third story porch of her rented apartment. The appeals are considered together.

1. Viewing the evidence in favor of the jury's verdict for Long, as we are compelled to do, *Ailion v. Wade*, 190 Ga. App. 151, 155 (4) (378 SE2d 507) (1989), it was that the residence had been in the Biggs' family since at least the 1940's and had been built in 1904. The structure was originally a two-story wooden Victorian home.[1] A wooden stairwell went up the rear of the house to the first landing where the stairwell made a 90 degree turn around the side of the house and proceeded upward to the then second floor. This stairwell was part of the original construction. The landing outside the apartment door was 28 inches wide. There were two wooden railings on the landing and the upper one was 36 inches above the landing.

In the late 1940's, the house was raised by adding a third story of brick under the original house. A new metal staircase to the second floor was added to the front of the house, providing the main entrance to the second and third floor apartments. Also, at that time, the original wooden stairwell up the rear of the house was lengthened to accommodate the added level.

Biggs' husband had taken care of the property from 1974 until his death in September 1986, when Biggs was bequeathed a life estate

---

[1] The house was located in Savannah's Historic District and, while eligible for the Historic Register, was not on it.

in the house. Until July 1987, the Biggs' daughter, Kennedy, managed the rental property which contained three units, one on each floor. In July 1987, LCH Rentals, a division of Horne, entered into a management contract with Kennedy, on behalf of Biggs, whereby Horne would handle the rental, operation, and maintenance of the premises. Horne was authorized to make any repairs up to the sum of $100 without prior approval of the owner. Approval was required for repairs over that amount. Kennedy never refused to give such approval. The property was inspected by Hazard, an agent of Horne, prior to entering into the management agreement. When the then tenants moved out, Ms. Horne, one of the principals of Horne, personally went to the apartment on September 25, 1990 and inspected it. At that time, she walked out on the third floor landing, grasped the upper wooden railing, and attempted to shake it. It did not appear unstable or deficient in any way to her. She was aware that, because the landing was narrow, the wooden screen door would touch the upper of the two railings when it was opened. She descended the rear stairway and noticed no problems with it.

In November 1990, Burke[2] and Long were sharing an apartment in Cypress Landings and decided to move closer to downtown. Both filled out a rental application for Horne. Burke went to the offices of Horne, put down a $25 deposit, and was given a key to go and inspect the third floor apartment, which she did. On November 8, 1990, a one-year lease was signed by both Burke and Long with LCH Rentals. The typed portion of the lease on the front page lists as tenant "Rebecca Davis." On the second page, the document is signed by both Burke and Long on two lines labeled "TENANT." A key was made by Burke for Long and Harvey, another friend who occasionally stayed at the apartment. The attached and incorporated two-page list of rules and regulations was also signed by both Long and "Davis" (Burke) on the lines labeled "Tenant."

Long lived there full-time until at least Christmas 1990. In January 1991, she told Horne that she was "leaving." She returned her key to Burke. Thereafter, she continued to stay overnight in the apartment two or three nights a week, generally on the weekends. Burke and Long were both aware that the screen door would strike the top railing when opened. Both had used the rear stairs and door before. During the time that Long lived there, the apartment was burglarized twice, with the burglar entering through the small window above the landing and to the left of the railing on the rear stairwell landing. After the first burglary, Burke notified Horne and the broken glass

---

[2] Burke's maiden name was Davis. She had married between the time of the accident and trial.

from the window was repaired. The second break-in was not reported to Horne by Burke. Burke owned a dog, which was in violation of the lease, and resulted in a complaint by a neighbor after the accident.

On Saturday, February 16, Long was picked up by Harvey at her parents' home in Effingham County at noon. They shopped for several hours and Long returned to her parents' home to eat dinner. Around 9:00 p.m., Harvey again picked her up and they proceeded to Savannah with the intention of later going to Malones, a local bar which they and their friends frequented. They stopped and bought a bottle of wine and each consumed a 12 to 14-ounce cup of wine during the several hours which they drove around the city. At 12:30 a.m., they picked up Faust and proceeded to Malones. They stayed about 15 or 20 minutes during which they did not consume additional alcohol. Burke was there and invited Harvey, Long and Jackson to come by the apartment after the club closed. These three proceeded to the apartment.

There was a light on the upper landing, but it had not worked for some time according to Burke. She had not reported this to Horne or requested that it be repaired. She had not replaced the bulb herself. Harvey, Long and Jackson proceeded up the rear stairs in that order. Harvey stepped onto the landing and was in the process of opening the screen door. Long stepped onto the landing and, as she testified, "[Harvey] and I were standing on the landing, and [Harvey] went to reach for — or to open the screen, and *I stepped back out the way and leaned back on the railing, and that's when the railing gave way.*" (Emphasis supplied.) The screen door opened from the left side of the landing out toward the railing on the right side as anyone approached it from the stairwell.

Long fell to the concrete below and was seriously injured. The police and ambulance were called and when the officer arrived, he found Long on the ground and the upper railing nearby. As stated in the incident report, proffered by Long and admitted by the court as part of the res gestae, the three "were on the 3rd floor fire escape/back porch. One of the other girls opened the door and [Long] stepped back with her back to the railing. The railing broke away and [Long] fell."

The stairs and the lower landing were all constructed of pressure-treated unpainted lumber. The upper landing and railing were constructed earlier than the stairs and were painted lumber.

The complaint alleged ordinary negligence. The four counts were that the defendants "knew of the hazardous condition of the railing which gave way"; that the "hazardous condition . . . had existed for such a long period of time that defendants had constructive knowledge of the hazardous condition"; that, "upon a reasonable and prudent inspection of the premises, defendants would have discovered

the hazardous condition of the railing"; and that the railing "was defectively designed and/or defectively constructed and defendants were thus negligent for allowing the premises to be in this condition."

In the pretrial order, Long states that the hazardous condition consisted of the use of "toenailing" to attach the end of the rail to the corner of the house.

2. Long argued below that, since she was not named in the printed and typed portion of the lease, even though she signed it as a tenant and lived there for a period, she was not legally a tenant. Further, she argued that, even if a tenant, the stairwell and landing were "common areas" subject to the duty imposed on landlords under OCGA § 44-7-14.

(a) Biggs' first enumeration and Horne's fourth enumeration both allege that the trial court erred in allowing the jury to decide whether Long was a tenant or an invitee for purposes of defining the duty owed. Motions for directed verdict and j.n.o.v. were made on this ground by defendants.

"As with other contracts, the construction of the provisions of a lease is generally one for the court to determine as a matter of law. OCGA § 13-2-1; *Peachtree on Peachtree Investors v. Reed Drug Co.*, 251 Ga. 692, 694 (1) (308 SE2d 825) (1983). 'Where the language of a [lease] is clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible. (Cit.)' *Stern's Gallery of Gifts v. Corp. Property Investors*, 176 Ga. App. 586, 593 (4) (337 SE2d 29) (1985)." *Reahard v. Ivester*, 188 Ga. App. 17, 19 (1) (371 SE2d 905) (1988).

Here, the only alleged ambiguity in the lease was that Long's name, although appearing at the end of the lease signed in her handwriting on a line labeled "Tenant," was not included in the blank space on the first page where Davis' name had been typed in. Here, there is no legal ambiguity in the lease, merely an omission from the typed portion supplied by the last and handwritten notations of the parties. See *American Cyanamid Co. v. Ring*, 248 Ga. 673, 675 (286 SE2d 1) (1982) (typed effective date of contract differed from handwritten date of execution by one party, written under his signature).

Long did not deny that she signed the lease at a time when she was sharing another apartment with Davis and that she had her clothes at the apartment and lived there for at least a month. At most, she contends she terminated the lease before the accident. The lease, however, provides for a one-year term not subject to termination. It allows for release of the obligation to pay rent for the entire year only with written permission of the landlord, which was not given here. " 'A surrender of premises by a lessee has no legal effect until accepted by the lessor. (Cits.)' [Cit.]" *Reahard*, supra.

Therefore, the court erred in not determining as a matter of law

that Long was a tenant at the time of her accident.

(b) In the rules and regulations signed by Long and Davis, Paragraph 19 provided that "No part of the yards, . . . walks or *stairs* shall be reserved for the private use of any tenant. . . ." (Emphasis supplied.)

Based upon this language, it was not error for the court to allow the question of whether the stairs, including the landings, were a common area to go to the jury. Therefore, we cannot say that, as a matter of law, the stairs were part of the leased premises.

3. Horne's second and third enumerations and Biggs' fifth and sixth enumerations allege the court erred in admitting into evidence the Standard Building Codes which had been adopted by Savannah in 1979 and 1985;[3] in not determining the applicability of the ordinances to the premises involved as a matter of law; and in not properly instructing the jury as to the ordinances.

(a) As to the admissibility of the ordinances tendered in court, the only objection voiced by defendants was that, as originally tendered, the proper foundation had not been laid because the ordinances were not certified. OCGA § 24-7-21. The ordinances were tendered again, with a certification, and no objection was voiced by defendants. Therefore, there is nothing in this regard for this court to review.

(b) Whether or not an ordinance, properly proven, applies to a certain property, however, is a question of law. *Connell v. Long*, 248 Ga. 716, 718 (1) (286 SE2d 287) (1982).[4]

If applicable to the premises, the court should have instructed the jury that if a violation of the municipal ordinance had occurred, with such violation being the proximate cause of Long's injury, a verdict for Long would be appropriate. *Thompson v. Crownover*, 259 Ga. 126, 129 (4) (381 SE2d 283) (1989); *Atlanta Recycled Fiber Co. v. Tri-Cities Steel Co.*, 152 Ga. App. 259, 266 (4) (262 SE2d 554) (1979).

Kern, a professional structural engineer, testified as Long's expert. He testified that he examined the upper landing and railing and made a review of the provisions of the 1979 and 1985 Building Codes. In his opinion, the landing and railing violated these provisions because the width of the landing was eight inches narrower than required; the top railing was six inches lower than required; there was no covering over the porch landing; and the load-bearing sufficiency

---

[3] Alterations were made in 1985 to the 1979 Code, but these are not at issue here. Therefore, as far as this situation is concerned, the requirements are the same.

[4] If such an ordinance is applicable and there has been a violation which is the proximate cause of any injury, there is a possibility of a claim for negligence per se. See *Northwestern Mut. Life Ins. Co. v. McGivern*, 132 Ga. App. 297, 301 (2) (208 SE2d 258) (1974). Here, however, Long's only claim was for ordinary negligence.

of the railing was less than the required fifty pounds per foot applied laterally.

Kern testified at length concerning "toenailing," a process used by carpenters to attach a railing.[5] The end of the rail attached to the corner of the house near the window was toenailed with three nails, which protruded into the siding and the abutting 4″ by 4″ corner post from a minimum of slightly less than two inches to a maximum of two-and-one-half inches. The other end of the rail attached to the descending banister was attached by nailing two nails from the top directly into a 2″ by 4″ which was also nailed to an abutting 2″ by 4″. Kern stated that, in his opinion, the fall was caused when Long's lateral force against the rail caused the toenailed end, which was rotted, to pull off the wall, causing the other end to disconnect.

Kern opined that, because of the rot, the rail, on February 17, 1991, would not bear the required 50 pounds per foot. He further testified, however, that toenailing was an accepted practice in carpentry and was not prohibited by the Codes. Further, he acknowledged that if toenailing were used on a good solid 2″ by 4″ it would, as constructed, bear the required 50 pounds. He further stated that the other end of the rail was constructed in compliance with applicable standards.

Kern said it was apparent that the house had been built before 1979 and that the stairway had obviously undergone several renovations. He opined that the landing and stairway were "rebuilt" in the mid 1980's.

Section 101.4 (a) and (c) of both Codes provides that if, within any 12-month period "alterations or repairs costing in excess of fifty (50) percent of the then physical value of the building are made to an existing building, such building shall be made to conform to the requirements of this code for new buildings, . . ." and if the cost of such alterations or repairs within any 12-month period "is more than twenty-five (25) but not more than fifty (50) percent of the then physical value of the building the portions to be altered or repaired shall be made to conform to the requirements of this code for new buildings. . . ." Subsection (f) allowed repairs not covered by subsections (a) and (c) which restored the building to its previous condition to be made with the "same kind of materials as those of which the building is constructed. . . ." Therefore, defects are required to be remedied in compliance with the Code only if these prerequisites are met. See *Watson v. Ellis*, 261 Ga. 434, 436 (406 SE2d 473) (1991) (affirmance by Rule 59 of the trial court's holding to this effect).

---

[5] In toenailing, the rail is attached by driving nails into the rail from an angle so that the nails protrude into the siding.

Accepting Kern's premise that the stairway and landing were "rebuilt" in the mid 1980's, there was no proof of the cost of the repairs or the physical value of the house so that a determination of the applicability of the Code requirements could be made. Therefore, it was error for the court to allow the jury to consider these provisions.

4. Next we consider the issue of Horne's and Biggs' motions for directed verdict, denial of which is asserted as error in Horne's first and Biggs' second and third enumerations.

(a) As to the negligent design and construction count, there was no evidence concerning Horne that showed any participation in any construction of the stairs and landing, either originally or in the way of repairs. See *Cherry v. Ward*, 204 Ga. App. 833 (420 SE2d 763) (1992). As to Biggs, there was no evidence that, at the time of the original construction of the stairway in 1904 and the addition of the extension in the mid-1940's, there was any defect in the design and construction so that she would be liable as a successor in title. See *Spence v. C & S Nat. Bank*, 195 Ga. App. 294, 295 (393 SE2d 1) (1990). In fact, Kern stated that toenailing would have been a proper method of construction if done properly with sound wood.

Neither was there any evidence that Biggs or her agent Horne had any actual knowledge that the rail was rotten, as alleged in the first count.[6]

Therefore, as to these two counts, defendants were entitled to a directed verdict. *Southern Gen. Ins. Co. v. Holt*, 200 Ga. App. 759, 760 (2) (409 SE2d 852) (1991).

(b) As discussed in Division 2 (b), supra, there was evidence to support Long's contention that the stairs were a "common area." So considering the evidence in Long's favor under the directed verdict standard, id., and there being no proven violation of an applicable housing code, liability as to the remaining two counts (constructive knowledge and duty to inspect) must be predicated upon OCGA § 51-3-1. *Commerce Properties v. Linthicum*, 209 Ga. App. 853 (434 SE2d 769) (1993). Compare *Thompson*, supra, and *Bastien v. Metropolitan &c. Assoc.*, 209 Ga. App. 881 (434 SE2d 736) (1993).

Considering Long's claim that the dimensions of the landing and railing, the banging of the screen on the railing, the lack of cover, and the presence of noticeable rot created a hazardous condition, whether or not in violation of any ordinance, it is apparent that Long had full and equal knowledge of these facts. Further, neither Long nor Burke made any report of this dangerous condition to either defendant. " 'The decisive issues are: "(1) fault on the part of [Biggs and Horne],

---

[6] Although this theory was not included in the pretrial order, evidence and argument were taken on it and the issue was actually litigated. OCGA § 9-11-16 (b); *Dunkin' Donuts of America v. Gebar, Inc.*, 202 Ga. App. 450, 451 (1b) (414 SE2d 683) (1992).

and (2) *ignorance of the danger on the part of [Long]*." ' " (Emphasis supplied; citations omitted.) *Powell v. Woodridge Condo. Assn.*, 206 Ga. App. 176 (424 SE2d 855) (1992).

In *Powell*, a tenant had lived in the unit for eight weeks and had regularly parked in an upper parking lot requiring her to use a set of stairs composed of weathered railroad ties which had no handrail. Powell considered the steps unsafe due to cracking and unevenness, but did not report her concerns and continued using the steps. She fell and injured herself. "Where the case involves a static [and patent] dangerous condition, the rule is well established that 'the basis of the proprietor's liability is his superior knowledge and if his invitee knows of the condition or hazard there is no duty on the part of the proprietor to warn him and there is no liability for resulting injury because the invitee has as much knowledge as the proprietor does.' (Citations and punctuation omitted.) [Cit.]" *Powell* at 177. See also, e.g., *Gyles v. Turner*, 184 Ga. App. 376 (361 SE2d 538) (1987); *Emory Univ. v. Duncan*, 182 Ga. App. 326 (355 SE2d 446) (1987) (physical precedent); *Folks, Inc. v. Dobbs*, 181 Ga. App. 311 (352 SE2d 212) (1986).

Therefore, defendants were entitled to a directed verdict on this theory.

The remaining legal theory is that of the rot in the railing, a "latent condition" which should have been discovered by the owner or her agent.

" '[A] landlord impliedly warrants that the rented premises are in good repair *at the time* they are rented; and if they are not, by reason of a *latent* defect . . . he is liable if he *actually* knew they were not, or if by the exercise of ordinary care he could have discovered that they were not, if the defective condition is latent and is the proximate cause of the injury. [Cit.]' " (Emphasis in original.) *Country Club Apts. v. Scott*, 154 Ga. App. 217, 219 (2) (267 SE2d 811) (1980), aff'd 246 Ga. 443 (271 SE2d 841) (1980). See *Bazemore v. Burnet*, 117 Ga. App. 849, 851 (161 SE2d 924) (1968). Here, there is no evidence that, in November when the apartment was rented, there was such a latent defect or that defendants actually knew of it.

"When a landlord is put on notice of a patent defect, he is also charged with knowledge of any latent dangerous condition that a reasonable inspection would have revealed. If he does not make any necessary repairs within a reasonable time, he can be held liable for any injuries resulting from the dangerous condition. [Cits.]" *Brandywine Townhouses v. Morrison*, 200 Ga. App. 425, 427 (1) (408 SE2d 422) (1991). Here, again, there is no evidence that notice of any patent problem was given to Horne, the investigation of which would have revealed the latent rot. The only evidence at trial was that, after the railing was down, the end of it evidenced some rot.

"[P]laintiff was well aware of the condition of the [porch and

railing] and [her] knowledge was, or at least should have been, equal to that of defendants. (' "An invitee is under an equal duty with the owner to use [her] sight to discover any defect or dangers. (Cits.)" [Cit.]' *Roberts v. Gardens Svcs.*, 182 Ga. App. 573, 574 [(356 SE2d 669) (1987)].)" *Harmon v. Reames*, 188 Ga. App. 812, 814 (374 SE2d 539) (1988).

5. We need not consider the remaining enumerations of error.

6. Long's motion to dismiss the appeal of Horne, Case No. A93A2077, or to hold appellee Horne in contempt for filing the appellee's brief four days after the expiration of the extended filing date, is denied.

*Judgment reversed. Pope, C. J., and Birdsong, P. J., concur.*

DECIDED FEBRUARY 7, 1994 —
RECONSIDERATION DENIED FEBRUARY 28, 1994 — ▮▮▮▮▮▮▮▮

*Forbes & Bowman, Morton G. Forbes, Catherine M. Bowman*, for Biggs.

*Newton, Smith, Durden, Kaufold & Rice, Wilson R. Smith*, for Horne, Upchurch, Waters & Associates.

*John M. Cullum, Bergen & Bergen, Frederick S. Bergen, Joseph B. Bergen*, for Long.